*Thomas F. Burke, M.D. v. Maryland Board of Physicians*, No. 0513, September Term 2020. Opinion by Wells, J.

**ADMINSTRATIVE LAW AND PROCEDURE – JUDICIAL REVIEW – AGENCY EXPERTISE – SCOPE OF REVIEW**

The scope of review is limited to the factual findings and legal conclusions made by the Board. Administrative agency final orders are subject to deferential judicial review. Appellate courts review final agency decisions in the light most favorable to the agency as agency decisions are presumed correct. A reviewing court may not substitute its judgment for the agency's expertise.

**ADMINSTRATIVE LAW AND PROCEDURE – JUDICIAL REVIEW – SUBSTANIAL EVIDENCE**

An agency's findings must be supported by substantial evidence in the record made before the Board. Substantial evidence is "evidence that 'a reasonable mind might accept as adequate.'" *Motor Vehicle Admin. v. Pollard*, 466 Md. 531, 537 (2019).

**HEALTH – PROFESSIONAL REGULATION – DISCIPLINE, REVOCATION, AND SUSPENSION – MORAL TURPITUDE**

Moral turpitude in the criminal context focuses on truthfulness whereas moral turpitude in the administrative context is a broader and more fluid concept. In the administrative law context, moral turpitude affects public confidence in the administration of government. *Stidwell v. Md. State Bd. of Chiropractic Exam'rs*, 144 Md. App. 613, 619 (2002).

**HEALTH – PROFESSIONAL REGULATION – DISCIPLINE, REVOCATION, AND SUSPENSION – CRIMINAL CONVICTION – MORAL TURPITUDE**

Based on the precedent established in *Stidwell*, 144 Md. App. 613, we hold that the appellant's "intentional and knowing" decision to prescribe controlled dangerous substances outside the course of acceptable medical standards constituted a crime of moral turpitude. While the appellant may still have credibility to testify in court, his actions decreased the public's confidence in the practice of medicine.

**HEALTH – PROFESSIONAL LICENSING – MORAL TURPITUDE – PRESCRIPTIONS – CONTROLLED DANGEROUS SUSBTANCES – GUILTY PLEA**

The appellant's guilty plea to five counts of the misdemeanor offense of writing prescriptions for controlled dangerous substances outside the scope of the medical profession was a conviction for a crime involving moral turpitude. Md. Code Ann., Crim Law § 5-902. Here, the Board properly concluded that the appellant pleaded guilty to a

crime involving moral turpitude because the appellant's actions undermined the public's confidence in the practice of medicine.

**CONSTITUIONAL LAW – DUE PROCESS – PROPERTY INTEREST – MEDICAL LICENSE**

A licensed medical professional has a property right in their medical license and this right cannot be deprived without due process of law. The right to practice medicine is subject to the police power of the State to regulate public health and safety.

**CONSTITUIONAL LAW – DUE PROCESS – PROPERTY INTEREST – MEDICAL LICENSE**

While the appellant had a property interest in his license, the State did not deprive him due process by summarily suspending his license because the property right was subject to the State's police powers.

**ADMINSTRATIVE LAW – JUDICIAL REVIEW – ARBITRARY AND CAPRCIOUS**

Arbitrary and capricious review applies to review of the agency's discretionary functions. A reviewing court applies a high level of deference to an agency's exercise of its discretionary power. A reviewing court will only intervene in an agency's discretionary decisions if the agency acted "arbitrary or capricious."

**ADMINSTRATIVE LAW – JUDICIAL REVIEW – ARBITRARY AND CAPRCIOUS – DEFERENCE TO AGENCY**

Here, the agency's decision to charge the appellant under Md. Code Ann., Health Occ. §14-404(b), rather than § 14-404(a) was not arbitrary or capricious. The guilty plea provided the necessary facts for the Board to conclude that the appellant pleaded guilty to a crime involving moral turpitude. The Board properly exercised its discretion in choosing to proceed with summary disposition under §14-404(b).

**HEALTH – PROFESSIONAL REGULATION – DISCIPLINE, REVOCATION, AND SUSPENSION – HEARING**

Md. Code Ann., Health Occ. §14-404(b) mandates license revocation if the Board concludes an individual has been convicted of or pleaded guilty to a crime involving moral turpitude. The Board may hold a hearing, but hearings are solely limited to contestable issues to allow for expedited and summary disposition. Crimes involving moral turpitude will ordinarily be resolved without the need for evidence or fact-finding, thus eliminating the need for a hearing.

**HEALTH – PROFESSIONAL REGULATION – DISCIPLINE, REVOCATION, AND SUSPENSION – HEARING**

In this case, the agency's decision to deny the appellant's request for a hearing was not arbitrary or capricious because the statute allows the Board to proceed with summary disposition after an individual has been convicted of a crime involving moral turpitude.

Circuit Court for Baltimore City
Case No. 24C19007001

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0513

September Term, 2020

_____

THOMAS F. BURKE, M.D.

v.

MARYLAND BOARD OF PHYSICIANS

_____

Berger,
Friedman,
Wells,

JJ.

_____

Opinion by Wells, J.

_____

Filed: April 28, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

After Doctor Thomas F. Burke entered guilty pleas to five counts of prescribing controlled dangerous substances in violation of Md. Code Ann., Crim. Law ("CR") § 5-902(c), the Maryland State Board of Physicians (the "Board") found that his conduct constituted crimes of moral turpitude and revoked his medical license. The Circuit Court for Baltimore City affirmed. Dr. Burke appealed. We affirm the circuit court's decision.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Doctor Burke was licensed to practice medicine in Maryland on July 21, 1995, under license number D47746. He remained a practicing physician until the Board revoked his license on November 20, 2018. Dr. Burke is board-certified by the American Board of Internal Medicine in general Internal Medicine, Pulmonary Disease, Critical Care and Sleep Medicine. He is also certified in Sleep Medicine by the American Board of Sleep Medicine. Beginning in 2001 and up until his license was revoked, he practiced at Chesapeake Pulmonary Associates in Fallston.

### A. Dr. Burke's Criminal Charges

The Grand Jury for Harford County returned a sixty-two-count indictment against Dr. Burke on February 28, 2018, charging him with various offenses related to the distribution, possession, or the writing of prescriptions for controlled dangerous substances ("CDS"). On January 28, 2019, Dr. Burke pleaded guilty to five counts, each alleging a violation of CR § 5-902(c), namely, writing prescriptions outside "the course of regular professional duties." At the plea hearing, he admitted to writing several prescriptions for

Schedule II and IV CDS,[1] such as, Valium (Diazepam), Xanax (Alprazolam), Adderall (Amphetamine), and Oxycodone for his long-term girlfriend, his brother, and his neighbor. Dr. Burke admitted that he did not conduct a medical examination for any of these individuals nor did he provide a medical rationale for any of the prescriptions. He insisted that he wrote these prescriptions because none of the recipients had a primary care physician and, according to Dr. Burke, each individual had been prescribed the same medications by a physician on a prior occasion.

On January 28, 2019, the Circuit Court for Harford County sentenced Dr. Burke to two-years' incarceration on each count, to be served consecutively, with all but three years suspended and imposed a period of probation. The court gave credit against the sentence for time served awaiting disposition. As a condition of the plea, Dr. Burke surrendered his Drug Enforcement Administration and Maryland CDS registrations during the term of probation.

**B. Maryland Board of Physicians Initial Proceedings**

On November 20, 2018, prior to Dr. Burke entering the guilty pleas as described, the Board summarily suspended his medical license under Md. Code Ann., State Gov't § 10-226(c)(2) after concluding that emergency action was required to protect the public's health, welfare and safety. Dr. Burke did not challenge this summary suspension.

---

[1] Schedule II drugs include "drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous." *Drug Scheduling*, Drug Enforcement Admin., https://www.dea.gov/drug-scheduling. Oxycodone and Adderall are Schedule II drugs. *Id.* Schedule IV drugs include "drugs with a low potential for abuse and low risk of dependence." *Id.* Xanax is Schedule IV. *Id.*

Later, on December 3, 2018, the Board charged Dr. Burke with violating Md. Code, Health Occupations ("HO") § 14-404(a)(3)(ii) and (a)(27).[2] Dr. Burke requested a Disciplinary Committee for Case Resolution Conference ("DCCR") as provided by HO § 14-404(a). The DCCR conference was initially scheduled for April 2019, but Dr. Burke requested a postponement, so the hearing was rescheduled to September 25, 2019.

In the meantime, on May 7, 2019, the Office of Attorney General ("OAG") filed a petition to revoke Dr. Burke's medical license based on his January 2019 convictions. The Board charged Dr. Burke under HO § 14-404(b)[3] and issued a petition to show cause.

---

[2] (a) Subject to the hearing provisions of § 14-405 of this subtitle, a disciplinary panel, on the affirmative vote of a majority of the quorum of the disciplinary panel, may reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:
  (3) Is guilty of:
          (i) Immoral conduct in the practice of medicine; or
          (ii) Unprofessional conduct in the practice of medicine;

*          *          *

  (27) Sells, prescribes, gives away, or administers drugs for illegal or illegitimate medical purposes….

Md. Code, Health Occupations Article § 14-404(a)(3)(ii) and (a)(27).

[3] (b)(1) On the filing of certified docket entries with the Board by the Office of the Attorney General, a disciplinary panel shall order the suspension of a license if the licensee is convicted of or pleads guilty or nolo contendere with respect to a crime involving moral turpitude, whether or not any appeal or other proceeding is pending to have the conviction or plea set aside.

  (2) After completion of the appellate process if the conviction has not been reversed or the plea has not been set aside with respect to a crime involving moral turpitude, a disciplinary panel shall order the revocation of a license on the certification by the Office of the Attorney General.

3

These charges were in addition to the charges that had been previously filed under HO § 14-404(a). Dr. Burke and his counsel responded to the show cause petition on June 24, 2019 requesting that the Board deny the petition.

On September 9, 2019, the Board issued a Final Decision and Order and revoked Dr. Burke's medical license. The Board found that Dr. Burke's convictions on five counts of prescribing CDS outside the course of his regular professional duties constituted crimes of moral turpitude and were violative of the standards of the medical profession. The Board then cancelled the September 25, 2019 DCCR because the Board had now revoked Dr. Burke's license under HO § 14-404(b)(2), which does not require the Board to hold a hearing if it concludes that the conduct underlying the revocation involved moral turpitude.

## C. Judicial Review of the Board's Decision

On October 9, 2019, Dr. Burke filed a petition for judicial review in the Circuit Court for Baltimore City. The Board opposed. After the June 25, 2020 hearing, the circuit court affirmed the Board's decision in a written memorandum and order. Dr. Burke filed a timely appeal.

## Standard of Review

The Maryland Board of Physicians is an adjudicative administrative body in the Executive Branch of the Maryland state government and "its decisions are subject to the same standards of judicial review as adjudicatory decisions of other administrative agencies." *NIHC, Inc. v. Comptroller of Treasury*, 439 Md. 668, 683 (2014). This Court confines its review to the administrative agency's decision and does not review the decision of the circuit court. *Motor Vehicle Admin. v. Pollard*, 466 Md. 531, 537 (2019); *Frey v.*

4

*Comptroller of Treasury*, 422 Md. 111, 136-37 (2011) (noting that "[o]n review of an agency's decision, we focus on the agency's decision and look past the circuit court's decision"); *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160 (2005) (explaining that the Court "review[s] directly the action of the agency, rather than the decision of the intervening reviewing courts").

Final decisions are reviewed "in accordance with the well-established principles of administrative law." *Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 354 (2013). An administrative agency's final order "is subject to deferential judicial review." *Id.* (quoting *Carriage Hill Cabin John, Inc. v. Md. Health Res. Planning Comm'n*, 125 Md. App. 183, 220 (1999)); *Md. Nat'l Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 84 (2009) ("Review of an administrative agency's action generally is a narrow and highly deferential inquiry."). A reviewing court reviews "the agency's decision in the light most favorable to it" because the agency's decision "is prima facie correct and presumed valid" as it is within the agency's role to resolve evidentiary conflicts. *Md. Aviation Admin v. Noland*, 386 Md. 556, 571 (2005) (quoting *Bd. Of Physician Quality Assurance v. Banks*, 354 Md. 59, 67-69 (1999)); *Md. State Bd. of Social Exam'rs v. Chertkov*, 121 Md. App. 574, 583 (1998) ("Final decisions are presumptively correct, and a court must show deference both to findings of fact and drawings of inferences by an agency.").

This Court, however, cannot uphold or reverse the decision of the Board on any grounds "other than the findings and reasons set forth by the [Board]." *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 503 (2014); *Frey*, 422 Md. at 137;

5

Md. Code Ann., State Gov't § 10-222 (h)(1-3) (explaining that on review the court may remand the case, affirm the final decision or "reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion or decision . . . is unsupported by competent, material, and substantial evidence in light of the entire record as submitted" or "is arbitrary or capricious").

The substantial evidence standard refers to "evidence that 'a reasonable mind might accept as adequate.'" *Pollard*, 466 Md. at 537; *Frey*, 422 Md. at 136-37 (explaining that substantial evidence "consider[s] whether a reasoning mind reasonably could have reached the factual conclusion the agency reached"). This standard is applied to both the agency's factual findings and mixed questions of law and fact, such as to "issues of whether the agency applied the law correctly to the facts." *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 84; *Frey*, 422 Md. at 137 ("We review factual findings and inferences therefrom under a substantial evidence standard."); *Gen. Motors Corp. v. Bannings Beltway Pontiac*, 138 Md. App. 671 (2001).

The entire record is reviewed to determine whether the final order is "supported by substantial evidence and correct conclusions of law." *Pollard*, 466 Md. at 537; *Bd of Directors of Cameron Grove Condo., II v. State Comm'n on Hum. Relations*, 431 Md. 61, 80 (2013); *Para*, 211 Md. App. at 354 (explaining that the reviewing court looks to "whether the agency's findings were supported by substantial evidence in the record made before the agency"); *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 84 (noting that the reviewing court examines whether "there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the

6

administrative decision is based on an erroneous legal conclusion"); *Noland*, 386 Md. at 571 (quoting *Banks*, 354 Md. at 67-69) (explaining that a reviewing court is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law"); *Stidwell v. Md. State Bd. of Chiropractic Exam'rs*, 144 Md. App. 613, 616 (2002). The Court, however, has the authority "to overrule an agency's factual finding only when the finding is 'unsupported by competent, material, and substantial evidence in light of the entire record as submitted.'" *Spencer v. Bd. of Pharmacy*, 380 Md. 515, 529 (2004) (citing State Gov't § 10-222(h)(3)(v)).

Great weight is afforded to the legal conclusions drawn by the agency "when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Frey*, 422 Md. at 138. Although the reviewing court affords great weight to the legal conclusions drawn from the interpretation of the agency's statutes, the court affords no deference to an agency's "application and analysis of caselaw." *Pollard*, 466 Md. at 527. On judicial review, this Court may substitute its judgment for the agency's judgment to determine whether the agency's conclusions of law are correct. *Spencer*, 380 Md. at 528 (2004).

## DISCUSSION

### I. Substantial Evidence Supports the Board's Conclusion that Dr. Burke Committed Crimes of Moral Turpitude

#### a. Parties' Contentions

Dr. Burke contends that the Board's decision to revoke his license was not based on substantial evidence. He claims the Board failed to analyze the specific facts and circumstances of his case before concluding that he pleaded guilty to crimes of moral turpitude. Therefore, in his opinion, the Board had no grounds to revoke his medical license. The Board argues that substantial evidence supports its decision. The Board emphasized that the term "moral turpitude" is not limited to its common law definition but has a broader meaning in the administrative law context.

### b. Moral Turpitude

We have said that the phrase "moral turpitude" is "chameleon-like, adopting different shades of meaning in different legal contexts," eluding a fixed definition. *Stidwell*, 144 Md. App. at 617. Generally, moral turpitude "has been defined . . . as importing 'an act of baseness, vileness or depravity in the private and social duties which [one] owes to his fellow[s]…, or to society in general, contrary to the accepted and customary rule of right and duty between [persons].'" *Att'y Grievance Comm'n of Md. v. Walman*, 280 Md. 453, 459 (1977) (citing *Braverman v. Bar Ass'n of Balt.*, 209 Md. 328, 344 (1956)). The expression "moral turpitude," as developed at common law, referred to "infamous crimes, that precluded their perpetrators from testifying."[4] *Oltman v. Md. State Bd. of Physicians*, 162 Md. App. 457, 484 (2005) (citing *Stidwell*, 144 Md. App. at 616).

---

[4] While moral turpitude does not refer to any specific set of crimes, infamous crimes included "treason, felony, perjury, forgery, and other *crimen falsi* offenses, which impressed upon their perpetrator such a moral taint that to permit the perpetrator to testify in legal proceedings would injuriously affect the public administration of justice." *Oltman*, 162 Md. App. at 484.

8

While Maryland has abrogated the statute disqualifying individuals convicted of infamous crimes from testifying, these crimes may still be used to impeach witnesses. *Stidwell*, 144 Md. App. at 617. In a criminal context, moral turpitude tends to focus "primarily on truthfulness," whereas in the administrative law context it is a more fluid concept. *Id.* at 618. "For the business of professional licensing and public appointments, the expression [moral turpitude] strikes the broader chord of public confidence in the administration of government." *Id.* at 619; *Oltman*, 162 Md. App. at 484 (explaining moral turpitude is broadly defined in terms of professional licensing).

*Stidwell* is instructive. There, the Maryland State Board of Chiropractic Examiners denied the petitioner's application to practice massage therapy because of the petitioner's prior conviction for solicitation. 144 Md. App. at 615. The circuit court affirmed the Board's conclusion that solicitation was a crime of moral turpitude. *Id.* at 615-16. This Court held that while the appellant was "qualified to give testimony, or to be certified in another profession," the appellant's "prurient offense casts an unsavory, even menacing shadow" over the field of massage therapy. *Id.* at 618. We explained that the definition of moral turpitude is different in the context of administrative law and so, "a person who has credibility to testify may not have the public's confidence to practice certain professions or to serve on a governmental board." *Id.* at 618.

### c. The Elements of CR § 5-902 Establish Moral Turpitude.

Dr. Burke next argues that the offense to which he pleaded guilty did not constitute a crime of moral turpitude. We disagree and explain. Determining whether an individual has been convicted of a crime involving moral turpitude "necessarily begins with an

9

examination of the criminal statute itself." *Walman*, 259 Md. at 460. If the criminal statute does not establish moral turpitude on its face, then the analysis "hinges on the facts present in the individual case at hand." *Id.* at 462.

The statute to which Dr. Burke pleaded guilty is CR § 5-902(c),[5] which, in relevant part, states:

> (c) An authorized provider may not prescribe, administer, manufacture, distribute, dispense, or possess a controlled dangerous substance, drug paraphernalia, or controlled paraphernalia except:
> (1) in the course of regular professional duties; and
> (2) in conformity with this title and the standards of the authorized provider's profession relating to controlled dangerous substances, drug paraphernalia, or controlled paraphernalia.

Dr. Burke pleaded guilty to five counts of prescribing CDS outside "the course of regular professional duties" and not within "conformity . . . [of] the standards of [his] profession," specifically, Oxycodone, Amphetamine (commonly known as "Adderall"), Alprazolam (commonly known as "Xanax") and Diazepam. In entering a guilty plea to these charges, Dr. Burke admitted to engaging in conduct "that constitute[d] all the elements of a formal criminal charge." *Metheny v. State*, 359 Md. 576, 599 (2000) (citing *Sutton v. State*, 289 Md. 359, 364 (1981)). A guilty plea is the admission of guilt of a substantive crime. *Id.* His guilty plea established his guilt and admission to prescribing CDS not in accordance with his professional duties.

---

[5] Dr. Burke urges us to conclude that the circuit court erred as a matter of law because the circuit court concluded that the Board did analyze the elements of the statute, even though the Board made conflicting statements at the trial. We note, however, that we look past the circuit court's decision and focus on the Board's Final Order. *Pollard*, 466 Md. at 537.

Even though Dr. Burke pleaded guilty to knowingly and intentionally writing prescriptions for CDS outside the accepted medical practices, he tries to justify his actions. He urges this Court to recognize that "[t]he sole 'crime' for which [he] endured seventeen months in prison (after pleading guilty following four postponements of his trial) and had his medical license revoked, was his failure to document his clinical rationale or perform a sufficiently thorough examination prior to issuing prescriptions to three individuals with whom he shared a personal relationship." This characterization ignores the actual language of Dr. Burke's guilty plea. Dr. Burke "did not dispute the elements of the charges to which he pled guilty and he accepted the plea agreement."[6] He did not plead guilty to a failure to properly document a clinical rationale; that was not an element of the crime. The specific language of the plea agreement was that Dr. Burke "knowingly and intentionally" prescribed CDS to individuals who were not his patients and whose complete medical history he did not know. Further, there is every indication that at least one of the people for whom Dr. Burke wrote a prescription, his girlfriend, was selling the drugs he had prescribed. Dr. Burke was living with his girlfriend. The police arrested Dr. Burke as part of their investigation of his girlfriend. Dr. Burke's characterization not only ignores the statutory language but also completely disregards the criminality of his behavior.

---

[6] THE COURT: And are you entering the guilty plea on those five counts because you are, in fact, guilty of those five counts?
[DR. BURKE]: Yes, your honor.
THE COURT: All right. Based on the statement in support of the plea and the Defendant's guilty plea, I do find the Defendant is guilty beyond a reasonable doubt as to those five counts.

Dr. Burke argues that "the simple possession of one (1) sleeping pill, by a physician, if self-prescribed, regardless of the documentation, could be sufficient to satisfy the elements of this statute" but, he claims, this action would hardly constitute a "crime involving moral turpitude." This argument, again, ignores the gravity of his conduct. The issue is not whether Dr. Burke wrote a prescription for one sleeping pill, but rather Dr. Burke wrote multiple scripts for drugs such as Xanax, Oxycodone, and Adderall to people who were not his patients. The Board explained that Dr. Burke's conviction involved moral turpitude because "based on the facts of this case, [he] acted contrary to the accepted and customary rule of right and duty that he owes to his fellow citizens in the [S]tate of Maryland." The Board concluded that Dr. Burke's criminal conduct "showed such disregard for social norms and the ethical standards of the medical profession that he undermined the public's confidence in the profession." We agree.

Dr. Burke urges us to find an exception to the statute and overlook the facts of his guilty plea. He argues that "[a]n uninterested person reading the Revocation Order, without any prior knowledge of this case would have no way of knowing if Dr. Burke was prescribing narcotics to be sold by a drug cartel for his own personal gain or writing five prescriptions for his spouse in an emergency setting." Once again, this argument ignores that Dr. Burke pleaded guilty to prescribing drugs to individuals who were not his patients. Dr. Burke seems to suggest that he should be given a pass for his behavior by having us find a "friends and family exception" in the statute. We decline to do so. Regardless of whether the drugs were sold to a drug cartel or prescribed to friends, under Maryland law,

12

a doctor may not use their license to prescribe CDS in a manner inconsistent with the standards of their profession.

Dr. Burke also argues that if the Board had "carefully parsed out and properly considered the *actual* facts of the offenses for which Dr. Burke pled guilty," then it would have concluded that his actions did not involve moral turpitude. Dr. Burke emphasizes that in failing to analyze "the *actual* facts" the Board did not properly consider the plea agreement or the proceedings. We are not convinced.

The Board was required to consider "at least one of the following: (i) stipulated statement of facts or statement of facts on the record; (ii) plea agreement containing agreed facts; (iii) transcript of plea agreement proceedings or (iv) written or transcribed opinion or statement." COMAR 10.32.02.04(C)(1)(b). The Board is not required to include a certain number of references or specific facts, but rather it is only required to consider "at least one," which we conclude the Board did in citing the plea agreement.

Dr. Burke goes on to rationalize his behavior by saying that he prescribed "non-narcotic, minimal abuse potential, anti-anxiety medication to his brother (who has suffered from debilitating lifelong anxiety) . . . and to a neighbor who injured herself and was temporarily unable to sleep." He also indicated that he prescribed Oxycodone for his girlfriend when she sprained her ankle and that he prescribed her Xanax and Adderall.[7]

---

[7] While Xanax (Alprazolam) is classified as a drug with a low-abuse potential, Xanax has become "one of the most widely prescribed benzodiazepines" and "many prescribers consider alprazolam to have high misuse liability." Nassima Ait-Daoud, M.D., et. al., *A Review of Alprazolam Use, Misuse, and Withdrawal*, J. Addiction Med. (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5846112/. Alprazolam "is significantly more toxic than other benzodiazepines in cases of overdoses and should be avoided in

Further, Dr. Burke explained that he prescribed his girlfriend—an individual who struggles with an opioid addiction—oxycodone as a means of ensuring she would not purchase heroin to cope with the pain of her sprained ankle.

In its Final Order, the Board explained that "the public relies on medical professionals to appropriately prescribe drugs because lay people, especially those with an addiction problem, do not know and have no way of knowing which drugs are appropriate to be taking" (citing the plea agreement proceedings). While Dr. Burke contends that his actions were not "shocking to the moral sense of the community," we disagree. Dr. Burke's decision to prescribe drugs "outside of the standards of the medical profession" could have led to an overdose, especially in persons with a history of substance use and "show[s] such disregard for social norms and ethical standards of the medical profession that he undermined the public's confidence in the profession." As the court explained at the plea hearing, "[w]e rely on medical professionals to make decisions and make recommendations and make prescriptions for us because we don't know. We have no way of knowing." [E. 257].

In *Att'y Grievance Comm'n of Md. v. Proctor*, the respondent pleaded guilty to possessing cocaine. 309 Md. 412, 414 (1987). The Attorney Grievance Commission filed for disciplinary action and the circuit court concluded that the respondent engaged in illegal

---

patients at increased risk of suicide, or who are using **alcohol**, **opioids**, or other sedating drugs." *Id.* In 2019, about 16% of overdose deaths involving opioids also involved benzodiazepines. *Benzodiazepines and Opioids*, Nat'l Inst. Drug Abuse, https://www.drugabuse.gov/drug-topics/opioids/benzodiazepines-opioids. Dr. Burke prescribed Alprazolam (Xanax) to his brother and his girlfriend who both have substance use problems.

conduct involving moral turpitude because he possessed "both marijuana and cocaine," "personally used both drugs" and that he possessed marijuana with the intent to distribute. *Id.* at 414. The Court held that "the illegal conduct engaged in by Respondent involved moral turpitude." *Id.* at 419. The Court reached this conclusion because even though the respondent was not convicted of this offense, the respondent acknowledged that sufficient evidence existed to sustain the circuit court's finding that the respondent possessed marijuana with the intent to distribute. *Id.* at 418. The Court explained that violations of the relevant CDS statute "will ordinarily involve moral turpitude," but emphasized that "each case must be decided on its own facts." *Id.* at 419.

Unlike in *Proctor*, where the respondent had not been convicted of intent to distribute marijuana, here, Dr. Burke pleaded guilty to five counts of "knowingly and intentionally" prescribing several CDS outside "the course of regular professional duties" and out of conformity with "Title 5 of the Criminal Law Article and the standards of the authorized provider's profession." Like in *Proctor* where the Court emphasized that determinations of moral turpitude require consideration of the facts, here, the Board considered the facts at issue to determine whether the elements of the crime that Dr. Burke pleaded guilty to involved moral turpitude. The facts outlined in the guilty plea support the Board's conclusion that Dr. Burke's crimes involved moral turpitude. *Proctor*, 309 Md. at 416.

We hold there is substantial evidence in the record to support the Board's conclusion that Dr. Burke's actions reflect negatively on "the many legitimate physicians who practice medicine in accordance with professional and ethical standards, and with respect for patient

15

safety and societal values."[8]  The Board properly concluded that Dr. Burke's actions were "directly connected to the medical profession" and that in writing "illegal prescriptions of CDS," he brought "shame to the medical profession." While we afford great weight to the legal conclusions drawn by the Board and defer to its expertise in finding that Dr. Burke committed a crime that involved moral turpitude in the administrative sphere, we independently draw the same conclusion.  *Frey*, 422 Md. at 138.  Dr. Burke's actions negatively impact "public confidence" in the medical profession and cast an "unsavory . . . shadow" over the field.  *Para*, 211 Md. App. at 355; *Stidwell*, 144 Md. App. at 618.

## II. The Board Did Not Act in an Arbitrary or Capricious Manner When It Denied Dr. Burke a Hearing Because HO §14-404(b)(2) Does Not Require That He Have One

### A. Parties' Contentions

Dr. Burke contends that he had a protected property interest in his medical license and that the Board denied him due process by revoking his license without providing him with an evidentiary hearing.  Dr. Burke also contends that the Board acted in an arbitrary and capricious manner in revoking his license under HO §14-404(b) because he should have been allowed to present the facts of his guilty plea under HO §14-404(a)(3)(ii) and (27) to assist the Board in concluding whether or not he committed a crime of moral

---

[8] Importantly, in 2019, 10.1 million individuals misused prescription opioids, 745,000 used heroin and 70,630 individuals died from a drug overdose. Dr. Burke's intentional decision to prescribe certain CDS outside the course of acceptable medical conduct to individuals with a history of problematic substance use fails to demonstrate that he has respect for "patient safety and societal values." *The Opioid Epidemic by the Numbers*, Dep't of Health & Hum. Servs, https://www.hhs.gov/opioids/about-the-epidemic/index.html (last updated Feb. 19, 2021).

turpitude. The Board argued that it followed the procedures outlined under HO §§14-404(a) and 14-404(b) and associated regulations. Therefore, the Board argues that it properly revoked Dr. Burke's license.

**B. Standard of Review**

This Court may reverse or modify the decision of the Board if it concludes that "any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision . . . is arbitrary or capricious." State Gov't § 10-222(h)(3)(viii). This standard applies to circumstances where the agency is acting in a discretionary function, rather than as an "interpreter of law" or "finder of fact." *Spencer*, 380 Md. at 530. "[T]he discretionary functions of the agency must be reviewed under a standard more deferential than either the *de novo* review afforded to an agency's legal conclusions or the substantial evidence review afforded an agency's factual findings." *Id.* If an agency's "exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements," then it is not reviewable. *Id.* at 531 (citing *Md. State Police v. Zeigler*, 330 Md. 540, 557-58 (1993)). The Court may only intervene if the "agency's exercise of discretion, in an adjudicatory proceeding, is 'arbitrary' or 'capricious.'" *Id.*

**C. Analysis**

**1. Property Interest in a Medical License**

Dr. Burke argues that he has a protected property interest in his medical license and that he thus must receive due process before his license is revoked. Dr. Burke is correct that "the right of a licensed physician to practice medicine is a property right of which a physician cannot be deprived without due process of law." *Md. Bd. of Physician Quality*

*Assurance v. Felsenberg*, 351 Md. 288, 306 (1998). However, this right is conditional and "subject to the paramount police power of the State." *Comm'n on Med. Discipline v. Stillman*, 291 Md. 390 (1981) (citing *Aitchison v. State*, 204 Md. 538, *cert. denied*, 348 U.S. 880 (1954)). The Court of Appeals explained in *Stillman* that no one "has an absolute vested right to practice medicine," but instead individuals have "a conditional right which is subordinate to the police power of the State to protect and preserve the public health." *Stillman*, 291 Md. at 405 (citing *Reetz v. People of the State of Michigan*, 188 U.S. 505 (1903)). Therefore, Dr. Burke's right to practice medicine is not absolute and his license may be revoked pursuant to conditions imposed by the State in the interest of public health and safety.

### 2. Entitlement to a Hearing

Dr. Burke argues that the Board denied him due process by revoking his license under HO § 14-404(b)(2) without holding a hearing and that this decision was arbitrary and capricious. Dr. Burke's argument fails because the Board's exercise of discretion did not violate any relevant regulations, statutes, "common law principles, due process, [or] other constitutional requirements" and so it cannot be reviewed under an arbitrary and capricious standard. *Spencer*, 380 Md. at 530.

Dr. Burke was not entitled to a hearing because the Board had the discretion to discipline Dr. Burke under HO § 14-404(a) or § 14-404(b). "The fact that a charge also might lie under §14-404(a) based on the conduct underlying a conviction for a crime involving moral turpitude does not preclude the board from proceeding under § 14-404(b)." *Felsenberg*, 351 Md. at 306. Further, a defendant "has no constitutional right to elect which

18

of two applicable statutes will form the basis of his indictment and prosecution." *Id.* at 304 (citing *Davis v. United Sates*, 385 A.2d 757, 759 (D.C. 1978)). Therefore, the Board did not err in electing to charge Dr. Burke under HO §14-404(b)(2), despite initially filing charges under HO § 14-404(a). Dr. Burke was not denied due process because under HO § 14-404(b)(2), the Board is permitted to proceed with summary disposition after an individual is convicted of a crime involving moral turpitude.

In *Felsenberg*, the Board denied Dr. Felsenberg the opportunity for a hearing because it was undisputed that he had been convicted of a crime. 351 Md. at 302. The Board reasoned that "the clear legislative intent" of the statute was "to avoid providing a licensee with a forum to re-litigate the integrity of the underlying criminal judgment, as well as the lack of discretion in imposing a sanction, neither a settlement conference or an oral argument would influence the outcome of the disciplinary proceedings." *Id.* at 296. The Court of Appeals explained that "when the charge rests solely upon the conviction, there is no need to inquire into the underlying conduct." *Id*. at 303. Additionally, in *Felsenberg*, the Court noted that "[w]hether the crime is one involving moral turpitude is an issue which ordinarily may be resolved without the need for evidence or fact-finding." *Id*. at 303. *Cf. Rudman v. Md. State Bd. of Physicians*, 414 Md. 243, 262 (2010) (finding that the Board lacked the authority to revoke the defendant's license where the defendant entered an *Alford* plea, was not found guilty of a crime and had not admitted to committing any criminal offense).

As in *Felsenberg*, where there was no dispute that the respondent had been convicted of a crime, so too here Dr. Burke does not deny that he pleaded guilty to CR §

19

5-902(c). But in his brief, Dr. Burke argues that the Board could not have "made a legal determination of whether Dr. Burke's misdemeanor offense [was] a crime involving moral turpitude without receiving actual evidence from Dr. Burke himself at an evidentiary [hearing] to ascertain the 'specific facts' the Board needed to determine Dr. Burke's level of culpability." But, as the Board argued in *Felsenberg*, and the Court of Appeals agreed, that HO § 14-404(b)(2), is not "a forum to re-litigate the integrity of the underlying criminal judgment" if the "charge rests solely upon the conviction." *Id.* at 296, 304. Dr. Burke also claims that the Board "rushed to judgment" by failing to "simply wait[] fourteen days to allow [him] to provide critical facts to assist the Board in its determination" as to whether he pleaded guilty to a crime of moral turpitude. As *Felsenberg* explained, the Board's determination regarding whether a crime involves moral turpitude may be resolved without the need for evidence or fact-finding. *Id.* at 303. Additionally, a proceeding under HO § 14-404(b)(2) is designed for an expedited and summary disposition and so, to allow Dr. Burke the opportunity to contest the factual basis of his guilty plea would run counter to the actual purpose of the statute. *Id.* at 304.

Dr. Burke's argument, that the Board acted in an arbitrary and capricious manner because it did not analyze the plea agreement, fails. The regulations do not require consideration of the guilty plea, but rather only that the Board review the documents included in the OAG's petition. COMAR 10.32.02.07. After the Board receives the petition, reviews the documents and determines that the respondent's actions come "within the language and intent of [§14-404(b)], and the disciplinary panel has a basis for finding preliminarily that it applies to the respondent," then the Board "shall vote" to issue a show

20

cause order to the respondent. COMAR 10.32.02.07C(2). The responses to a show cause order are limited to the following issues: "(A) lack of conviction or plea; (B) whether the crime is one involving moral turpitude; (C) misidentity of the respondent with the defendant in the criminal matter; and (D) other relevant issues, if any, *other than mitigation*." COMAR 10.32.02.07E (emphasis added).

Dr. Burke's response to the show cause petition did not claim that he was misidentified or that he had not pleaded guilty. Instead his response emphasized "mitigating factors" as to why his license should not be revoked. But, as noted, mitigating factors are not contestable issues to a show cause petition. COMAR 10.32.02.07E. Dr. Burke's response did not generate any "existence of a genuine issue[] of material fact or law." *Id.* The Board's decision to conduct a hearing was discretionary and even if the Board held a hearing, it would be limited to the above-described factors, which do not include mitigating factors. COMAR 10.32.02.07E(3).

Dr. Burke's license was summarily suspended on September 9, 2019, which was two weeks prior to the DCCR hearing scheduled for September 25. While Dr. Burke contends that the Board proceeded under §14-404(b)(2) with the intent to punish him for his failure to show up to the April 26, 2019 DCCR, Dr. Burke cites no facts for his bald assertion. He simply states that "the OAG engaged in a transparent attempt to deprive Dr. Burke of due process" and that OAG aimed to "punish him" for his request to reschedule the conference. We find no support in the record for this claim.

Under HO § 14-404(b), a respondent's right to a hearing is discretionary, in contrast to HO § 14-404(a). COMAR 10.32.02.07E(3). While Dr. Burke had the opportunity to

21

appear for a hearing under the charges under § 14-404(a)(3)(ii) and (27), he did not have that same right under § 14-404(b)(2). Nonetheless, Dr. Burke argues that the Board acted in an arbitrary and capricious manner in denying him a hearing pursuant to the "(b)" subsection of the statute. Dr. Burke highlights that the Board's decision was unprecedented when considering the "more than 200 cases decided in the months leading up to the Revocation Order." But, significantly, Dr. Burke ignores the fact that all those cases were disciplinary actions brought under HO § 14-404(a).[9]

In conclusion, we hold that the Board followed the statutory requirements in revoking Dr. Burke's medical license. Under the provisions of HO §14-404(b)(2), the Board could rely upon Dr. Burke's guilty plea to conclude that he committed crimes of moral turpitude. His guilty plea served as a means of providing for an expedited and summary disposition by the Board. *Felsenberg*, 351 Md. at 304. The Board, therefore, properly exercised its authority in revoking Dr. Burke's license and thus, did not act in an arbitrary and capricious manner.

---

[9] Dr. Burke argues that Dr. Atif B. Malik pleaded guilty to the "textbook example" of a crime involving moral turpitude, but still received an evidentiary hearing. The Board's decision, however, to give Dr. Malik a hearing was not based on an inconsistent application of HO § 14-404(b)(2), but rather it was based on the Board's decision to charge Dr. Malik under HO 14-404(a), whereas Dr. Burke was initially charged under HO § 14-404(a), but then he pleaded guilty and so, the Board chose to proceed under HO§ 14-404(b)(2). While Dr. Burke contends that the individuals received different sanctions for the same behavior, we note that both individuals did receive the same punishment—license revocation. *See Chertkov*, 121 Md. App. at 584-85 (explaining an agency's decision is arbitrary and capricious, even if supported by substantial evidence, when "individuals are given substantially different sanctions for identical conduct"). Although Dr. Malik did receive an evidentiary hearing, it was only because the Board proceeded under HO §14-404(a), rather than §14-404(b)(2).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**